UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                               :
CYNTHIA P. LEROY               :          3:13 CV 922 (JGM)
                               :
V.                               :
                               :
CAROLYN W. COLVIN,          :
ACTING COMMISSIONER OF      :
SOCIAL SECURITY            :
                               :          DATE: SEPTEMBER 2, 2014
-------------------------------------------------------- x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND
FOR REHEARING, AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER</u>

      This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

      On September 23, 2010, plaintiff, Cynthia P. Leroy, applied for DIB in which

application she claims that she has been disabled from February 8, 2006 to September 30,

2010, her date last insured, due to musculoskeletal impairments, migraine headaches,

diabetes, attention deficit disorder ["ADD"], and obesity. (Certified Transcript of

Administrative Proceedings, dated August 23, 2013 ["Tr."] 92, 160-63, 185; <u>see</u> Tr. 69-91,

204).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 93-99).  On

or about March 14, 2011, plaintiff filed a request for a hearing before an Administrative Law

Judge ["ALJ"](<u>see</u> Tr. 100-01; <u>see</u> Tr. 102-07), and on March 14, 2012, a hearing was held

before ALJ Jane A. Crawford, at which plaintiff and Dr. Steven Sachs, a vocational expert,

testified. (Tr. 26-67; <u>see</u> Tr. 110-59).  Plaintiff was and continues to be represented by

counsel. (See Tr. 26, 68, 108-09).  On March 30, 2012, ALJ Crawford issued her unfavorable decision finding that plaintiff was not disabled through September 30, 2010, the date she was last insured.  (Tr. 7-21).  On June 1, 2012, plaintiff filed her request for review of the hearing decision (Tr. 6), and on April 30, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

On June 28, 2013, plaintiff filed her complaint in this pending action (Dkt. #1), and on September 16, 2013, defendant filed her answer (Dkt. #8).[1]  On February 1, 2014, plaintiff filed her Motion for an Order Reversing the Decision of the Commissioner or for Remand for Rehearing, with brief in support.  (Dkt. #19; see Dkt. ##14-18, 20).  On May 6, 2014, defendant filed her Motion for an Order Affirming the Decision of the Commissioner, with brief in support. (Dkt. #23; see Dkts. ##21-22).

For the reasons stated below, plaintiff's Motion for an Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for Rehearing (Dkt. #19) is denied; and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #23) is granted.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1957, is married, and lives in a house with her husband and daughter, and her son lives with his girlfriend in an apartment located in this home.  (Tr. 31-32, 181, 193, 201).  Plaintiff has three large dogs; she feeds them, but she does not walk, bathe, or groom them.  (Tr. 32, 49-50, 193-94).  Plaintiff completed high school and has

---

[1]Attached to defendant's Answer is the certified administrative transcript, dated August 23, 2013.

"some college education."  (Tr. 35).

Plaintiff has a driver's license although it is "difficult" to look left when she is driving, as she must twist her body.  (Tr. 32-34, 196).[2]  Additionally, plaintiff gets "pins and needles in [her] right . . . and left [hands]" when she holds the steering wheel "for any length of time[,]" or after "[a]bout [twenty] minutes." (Tr. 34).

Regarding cooking and laundry, plaintiff testified that she does "everything normally but with multiple breaks[,]" although she also reported that her husband makes meals for the family.  (Tr. 46, 193, 195-96).  Her husband does the dishes and vacuums, and he vacuums their pool. (Tr. 47).  According to plaintiff, "[w]henever [she] do[es] the sweeping, [and] vacuuming, [with] that motion back and forth, [she] experience[s] the pain in the shoulder blade area, and [she has] to take breaks."  (Id.).  Plaintiff reported that she rides the lawn mower, and she tends to her vegetable garden.  (Tr. 196).   She also shops for groceries and clothing every two weeks.  (Tr. 197).

Plaintiff goes to the movies (although she is uncomfortable after two hours) and visits friends.  (Tr. 44, 48, 198).  She used to bowl, dance, play softball, and ride horseback, but can no longer do any of these activities.  (Tr. 48-49; see Tr. 197).  However, plaintiff still directs the lighting for five shows a year at the dance school she attended since age three.  (Tr. 49).  Plaintiff  testified that she has trouble with writing, putting on earrings, "holding anything for any length of time," including a hair dryer, and using her hand for extended periods.  (Tr. 53, 55; see also Tr. 194 (cannot hold arms up to use hair dryer, brush hair), 197).   According to plaintiff, she has limited range of motion with her head, and excessive

---

[2]When plaintiff met with her SSA intake interviewer, the interviewer noted that plaintiff "did not appear to have full range in her neck – as she turned her whole body when she looked from side to side."  (Tr. 202).

use of her arms causes "discomfort" to her arms, shoulders, and elbow.  (Tr. 225).  Additionally, "excess head tilting downward cause[s] pain and stress to [her] neck and shoulder blade area." (Id.).  She has difficulty reading because "after a while [her] arms don't want to hold [a book] up[,]" and it is difficult for her to look down. (Tr. 45, 197).  She also reports that she has difficulty lifting, squatting, standing, reaching, walking, sitting, and completing tasks. (Tr. 198).  Plaintiff also has pain in her right elbow.  (Tr. 53).   She is diabetic and must "be cautious about when [she] eat[s,]" and she gets fatigued.  (Tr. 54).

Plaintiff takes or has taken Tylenol (Tr. 195, 207, 224), Advil (Tr. 207, 224), Oxycodone (Tr. 188, 195, 224), Vicodin (Tr. 240), Ritalin (Tr. 240), Klonopin (Tr. 240, 274, 306-07, 330), Metformin (Tr. 188, 207, 224, 461, 473), Losartan Potassium or Cozaar (Tr. 188, 224, 461, 473), Metoprolol (Tr. 188, 224, 461, 473), Hydrochlorothiazide (Tr. 461, 473), Triamterene (Tr. 188, 207, 461, 473), and Methylphenidate.  (Tr. 188, 195, 207, 224, 461, 473).

At the time of her hearing, plaintiff was working part-time. (Tr. 32).  She explained that she returned to working at Subway of Southbury in 2007 or 2008, at which time she was working approximately twelve hours a week.  (Tr. 35-37, 226).  She worked until June 2009, and then resumed working again in 2010.  (Tr. 186; see Tr. 218, 226).[3]  Plaintiff has known the owner of Subway since he opened the franchise, and he has "accommodated anything [she has] needed."  (Tr. 50).   According to plaintiff, he "understands [her limitations] completely[,]" and he does not let her lift things, he "let[s] other employees know [that plaintiff is] not to do this or that[,]" and he is flexible with her hours.  (Tr. 50-51).  Plaintiff testified that she "usually [is out of work] a few days out of the month . . . and [her

_____

[3]In 2008-2009, plaintiff also worked as a hostess at a restaurant.  (Tr. 226).

4

employer] understand[s]." (Tr. 51). She does not go into work if she has back and shoulder pain, or migraines. (Id.).

She began working for Subway in 1996 or 1997;[4] she would set up the equipment, open the store, train employees, do orders and inventory, lift cases, stock coolers, do the prep work, make sandwiches, wait on customers, and make deposits at the bank. (Tr. 37-38, 220, 226; see Tr. 166-68, 171-73). She would stand, reach, and write or handle small objects for seven hours in the work day, and the heaviest weight she would lift was fifty pounds, although she frequently lifted twenty-five pounds. (Tr. 220). However, now she works in four hour shifts, and she can no longer lift anything heavy. (Tr. 38-39; see Tr. 174-75 (working four hours)). She goes into work by 7:00 a.m., puts on a pot of coffee, "make[s] a couple of breakfast sandwiches," gets the sinks prepped, and heats meatballs in the microwave. (Tr. 38-39, 221). Plaintiff estimated that she can lift fifteen pounds, or "[twenty], maybe tops[,]" (Tr. 43), and does not lift anything more than ten pounds when working. (Tr. 221). Repetitive movements "bother[]" her, and it is awkward for her to remove coolers or cases from the freezer as that action strains her back. (Tr. 39; see also Tr. 41 (pain from overuse or overdoing something)).

Plaintiff testified that she cannot work full-time because of the pain she experiences in her upper neck into the shoulder blade area, which gets "extremely sore and aches[,]" and "gets extremely tight and tense." (Tr. 40). She experiences pain on the left side, in the mid-shoulder blade area and up through the shoulder and down the left arm, and the pain is followed by a migraine. (Id.). She also has numbness and tingling in her right hand from a "lump" in her right hand. (Tr. 52-53).

_____

[4]Prior to working at Subway, plaintiff worked in a clerical job, in 1995-1996. (Tr. 218-19, 226).

Plaintiff testified that she can only stand for four hours before she needs a break, which entails sitting, stretching, lying down, or "anything to relieve the pressure." (Tr. 43-44). She cannot sit more than an hour without experiencing pain in her neck and in the shoulder blade area, at which time she has to walk around, or stretch, or lie down. (Tr. 44). She can move her neck "a little bit, but holding it [in a position] is the issue." (Tr. 46). According to plaintiff, she can handle stress "normal[ly,]" and can follow spoken instructions, but cannot follow written instructions. (Tr. 199). Plaintiff explained to the ALJ that she was always a "very active" person so she has "really . . . learned to adapt certain ways at home, [and] even with [her] work, to be able to just . . . keep busy." (Tr. 56-57).

Dr. Sachs, the vocational expert (Tr. 110-12, 149-51), testified that plaintiff's past work has two different DOT titles: a food sales clerk, which is light work, and a sandwich maker, which is medium work. (Tr. 60). When asked if a claimant could perform plaintiff's past work if the claimant was limited to light work, but could not reach overhead with the left, upper extremity, could only occasionally push and pull with the left upper extremity, is right-hand dominant, could frequently climb ramps and stairs, and could balance and stoop, and could not kneel, crouch, or crawl, or climb ladders, ropes and scaffolds, Dr. Sachs testified that such a claimant could perform the work of a sandwich maker and of a food sales clerk. (Tr. 60-62). However, if such a claimant could only bend her neck approximately forty-five degrees, such a person could not perform that work since full movement would be needed. (Tr. 62). However, with that profile, such a claimant could perform the light level work of a receptionist, a general office clerk, or a production inspector. (Tr. 62-63). If such a person was further limited in that the claimant could not reach overhead with either extremity, such a person could not perform the work of a food

6

sales clerk, but could still perform the work of a receptionist, general office clerk, or production inspector. (Tr. 63). If such a claimant would also have difficulty grasping small items, all jobs would be precluded. (Tr. 63-64). Similarly, if a claimant also had to leave work before the end of the workday, or would be absent two days a month, all jobs would be precluded (Tr. 64), and similarly, if the claimant was limited in occasional overhead use of both arms, all jobs would be precluded. (Tr. 64-65).

The vocational expert also testified that if a claimant was limited to light work with no overhead reaching with the left upper extremity, occasional repetitive use of the upper extremities, only occasional pushing and pulling with the left upper extremity, but could frequently climb ramps, stairs, balance and stoop, could not kneel, crouch, crawl, or climb ladders, ropes or scaffolds, and had neck movement limited to forty-five percent in lateral directions, flexion, and extension, then there would be no jobs available that such a claimant could perform. (Tr. 65-66). However, if such a hypothetical claimant could engage in frequent, as opposed to occasional, repetitive use of the upper extremities, the jobs of receptionist, inspector, and general office clerk, all could be performed. (Tr. 66).

### B. MEDICAL RECORDS

As stated above, plaintiff's alleged onset date is February 8, 2006. (See Tr. 92). Prior to plaintiff's onset date, plaintiff underwent back surgery on June 23, 2004, followed by physical therapy, continued x-rays, and treatment with Dr. Sayed Shahid. (See Tr. 251-59, 266-75, 277-81). Plaintiff was also seen regularly by her internist, Dr. Marianne Bette, in 2005 for bronchitis, insomnia, and neck pain. (See Tr. 308-09). Her relevant medical records begin when plaintiff was seen by Dr. Shahid on January 3, 2006; he noted that she had "disappeared[]" since the previous July as she had been "feeling better[,]" but then

7

while on vacation in Maine in August, she was knocked down by a wave, after which she experienced neck pain that worsened after she painted for two and a half days.  (Tr. 266). Dr. Shahid thought that she would require surgery.  (Id.).

On January 12, 2006, plaintiff underwent an MRI of her cervical spine without contrast, which revealed mild left joint hypertrophy at C2-3, spondylosis and mild bilateral uncovertebral and left facet joint hypertrophy at C3-4, residual right-sided spur at C4-5, mild residual diffuse end plate spur formation at C5-6, and small left forminal disc protrusion which could involve the left C7 nerve root at C6-7.  (Tr. 243-44, 286-87, 321-22, 487-88, 321-22).  On January 30, 3006, plaintiff underwent a preoperative medical evaluation at Danbury Hospital, during which she complained of left arm pain with numbness in her fingers.  (Tr. 310, 320).

On February 6, 2006, plaintiff was seen in the emergency room at Danbury Hospital for complaints of right shoulder and arm pain, for which she was given Vicodin.  (Tr. 240-42). Later that day, plaintiff was seen by Dr. Joseph DiGiovanni, of Danbury Orthopedics Associates, for "acute right shoulder pain[.]" (Tr. 330-31).  Dr. DiGiovanni noted that she had "exquisite shoulder pain, [such that she was] unable to move actively and passively[,]" but that following a subacromial injection of DepoMedrol and Novacain into the subacromial space, she "improved quite nicely."  (Id.).  Two days later, plaintiff underwent back fusion surgery at Danbury Hospital.  (See Tr. 233-39, 476-77, 479-82; see also Tr. 282-85, 478, 483-85; see generally Tr. 306).  Plaintiff was diagnosed with "[l]eft C7 radiculopathy with foraminal stenosis and C5-C6 and C6-C7 pseudarthrosis, status post C4 to C6 anterior fusion with instrumentation."  (Tr. 233).  X-rays of plaintiff's cervical spine taken on February 28, 2006 revealed "[n]o significant interval change, compared to the previous study performed

[on] [June 28, 2005,]" which revealed spondylosis.  (Tr. 276-77).

On March 21, 2006, Dr. Shahid recommended physical therapy; plaintiff's strength was normal and her range of motion was "slightly decreased." (Tr. 265).  Plaintiff returned to Dr. DiGiovanni on April 24, 2006 for right shoulder pain (Tr. 329), and three days later Dr. DiGiovanni noted the presence of "[t]endinosis involving the supraspinatus with . . . partial bursal surface tearing[,]" which was diagnosed as "impingement tendinosis." (Tr. 328; see Tr. 333-34 (MRI results)).  Physical therapy was prescribed.  (Tr. 328).

When plaintiff was seen in Dr. Shahid's office on May 16, 2006, her range of motion was good, and her surgical wound was healed, although she exhibited signs of shingles.  (Tr. 264).   The next day, plaintiff was seen by Dr. Bette for shingles.  (Tr. 304, 307).

Plaintiff underwent an MRI of her cervical spine on August 28, 2006, which revealed evidence for "bilateral laminotomies with excision of spinous processes from C4 through C6[,]" "[e]vidence for bilateral posterolateral fusion for C4 through C7 by transpedicular screws[,]" and "[e]vidence for anterior interbody fusion at C4-C5 and C5-C6." (Tr. 253, 319, 475).

She received physical therapy from March to October 2006, and made "slow but steady" progress. (Tr. 380, 412, 420; see Tr. 250, 379-433).  In early April, plaintiff reported that her pain level ranged from a two to a six on a scale to ten.  (Tr. 430).   Plaintiff reported that she "still tends to overdo" activity.  (Tr. 395, 404-05, 421, 430; see also Tr. 394).  At the end of October, plaintiff was discharged from physical therapy; the physical therapist noted that plaintiff had "missed [the] last [five] sessions of PT[.]" (Tr. 380).

Dr. Shahid saw plaintiff for a follow-up visit on December 5, 2006.  (Tr. 249). Plaintiff continued to complain of myofascial pain in the left side of the neck, but she reported being

a "very active and physical person."  (Id.). She had "recently [done] a lot of shoveling of dirt and paid for it having pain in the left trapezius and parascapular area[,]" and she reported getting "sore towards the end of the day." (Id.). Dr. Shahid advised plaintiff to exercise and to use a muscle relaxant at night.  (Id.).

An MRI taken on March 16, 2007 revealed moderate cervical spondylosis at C3-C4 and mild cervical spondylosis at C7-T1, marked right uncovertebral joint hypertrophic change contributing to moderate right neuroforaminal stenosis at C4-5, and post-operative change without focal disc herniation at C5-6 and C6-7.  (Tr. 247-48).  Plaintiff was seen for a follow up visit with Dr. Shahid on March 27, 2007, at which time she had "reasonable range of motion[,]" and he was "pretty satisfied with her recovery process[,]" so he "discharg[ed] her" to be seen on an as needed basis.  (Tr. 246).   Plaintiff had complained that she could not keep her neck bent while reading and that recent painting activities had "bothered her." (Id.).

In 2006, 2007 and 2008, plaintiff was treated by Dr. Bette for her high blood pressure (Tr. 294-95, 297, 302-05, 439; see also Tr. 311-13), which was "ok" (Tr. 291, 297), for bronchitis (Tr. 296, 298-99, 300-01; see Tr. 324 (treatment at a MinuteClinic); see also Tr. 314, 317), the flu (Tr. 291-92; see also Tr. 293 (MinuteClinic records), and for leg pain (Tr. 289-90).[5]

Diagnostic imagining of her pelvis and right hip joint on June 30, 2008 revealed no evidence of acute fracture or dislocation.  (Tr. 318).  On September 22, 2008, plaintiff was seen by John Sakowich, P.A. and Dr. DiGiovanni for "increasing pain to her left shoulder[,]" which was diagnosed as a "[r]otator cuff tear or longhead biceps tear of left shoulder with

---

[5]Plaintiff was seen at a MinuteClinic for an ear infection on January 5, 2008.  (Tr. 323).

history of impingement syndrome." (Tr. 327).  X-rays taken the same day revealed a normal left shoulder.  (Tr. 335).  Three days later, Dr. DiGiovanni noted that an MRI revealed a "small partial tear of the infraspinatus minus subacromial bursitis[,]" for which he recommended physical therapy, and if necessary, a corticosteroid injection.  (Tr. 326; <u>see</u> Tr. 332 (MRI results)).

In March and July 2009, Dr. Bette noted that plaintiff's hypertension was stable.  (Tr. 438-39; <u>see</u> Tr. 459).[6]  On May 15, 2009, plaintiff was seen by Dr. Frederick J. Watson of Neurosurgery, Orthopaedics & Spine Specialists, P.C. for a consultation for plaintiff's right knee pain.  (Tr. 461-62, 473-74).  Dr. Watson's impression was that plaintiff had "[c]honodromalacia of the patella and probably iliotibial band tightness and sublaxation of both knees."  (Tr. 462, 474).

On September 17, 2009, plaintiff underwent a chest x-ray and EKG, which were normal. (Tr. 315-16, 456-57; <u>see also</u> Tr. 450-52).  A month later, and again in February 2010, plaintiff complained to Dr. Bette of a dry cough.  (Tr. 436-37).  On May 7, 2010, plaintiff underwent an ultrasound of her abdomen which revealed a fatty liver. (Tr. 454).  In October 2010, plaintiff was seen by Dr. Bette after falling on her knee.  (Tr. 435).[7]  An MRI taken of plaintiff's hip and right pelvis revealed mild degenerative changes of the right hip joint.  (Tr. 453).

Plaintiff was seen by Dr. Bette in January 2011, at which time her hypertension was stable, and her diabetes "could have been better[.]" (Tr. 340; <u>see</u> Tr. 341-42, 444).  On January 18, 2011, plaintiff reported to Dr. Shahid that she was having "some discomfort in

---

[6]On June 1, 2009 and June 30, 2011, plaintiff underwent  mannograms, the results of which were unremarkable.  (Tr. 458, 500).

[7]The foregoing records post-date plaintiff's date last insured.

[the] middle of [her] back[;]" Dr. Shahid made a note to "check range and motion[,]" and plaintiff complained of a "problem with [her right] hand [and] arm." (Tr. 351-52).  Ten days later, plaintiff underwent an MRI of her cervical spine, which revealed "[s]light worsening of functional zone spondylosis, when compared to the prior study of January 2006[,]" and the "degree of stenosis at C3-4 and C6-7 ha[d] worsened from the prior examination[,] however[, was] no greater than mild in severity." (Tr. 349-50, 471-72).  Additionally, there was "[s]ignificant neural foraminal narrowing seen at several levels[.]" (Tr. 350, 472).  On January 31, 2011, plaintiff saw Dr. DiGiovanni for trigger finger, shoulder impingement, and tennis elbow, for which he prescribed physical therapy.  (Tr. 343-46, 356).  Two weeks later, plaintiff was seen by Dr. Shahid who noted that plaintiff "clearly has lost cervical range of motion[;]" she has "lost greater than 40-45% of her cervical motion in extension, flexion, and lateral rotation[,]" and she has "severe tendonitis in the right elbow which gets aggravated if she does any kind of physical activity that involves more using weights or repetitive motion." (Tr. 348).  Dr. Shahid also noted that plaintiff's neck "bothers her a lot[]" if she raises her arm "for any length of time." (Id.).  He opined that plaintiff "has continued to learn to live with her disability.  She remains disabled." (Id.).

Plaintiff began physical therapy on February 21, 2011 (see Tr. 361-62), and on March 22, 2011, plaintiff's physical therapist discharged her from his care, noting that due to plaintiff's "work conflicts[, she was] unable to be compliant [with] therapy." (Tr. 357; see Tr. 358-78).  Plaintiff was seen by Dr. Bette in April 2011 for fatigue (Tr. 434, 490), returned for a follow up appointment on July 12, 2011, at which she was "[d]oing well, no new complaints[,]" (Tr. 463), and was seen again in September 2011 for a cut on her shin and a sprained ankle.  (Tr. 464-65, 490).  On December 13, 2011, plaintiff underwent a holter

monitor test, the results of which were normal.  (Tr. 470, 499).  Plaintiff was seen by Dr. Bette for her diabetes on February 16, 2012. (Tr. 489).

C. MEDICAL OPINIONS

On December 6, 2010, Khurshid Khan, M.D., completed a Physical Residual Functional Capacity Assessment of plaintiff in which he opined that plaintiff can occasionally lift twenty pounds, she can frequently lift ten pounds, she can stand, walk or sit for six hours in an eight-hour day, she can frequently climb ramps and stairs, balance, stoop, kneel or crouch, and can occasionally climb ladders, ropes or scaffolds, or crawl.  (Tr. 75-76).

On February 23, 2011, Jerrold Goodman, PhD, completed a Psychiatric Review Technique of plaintiff for ADD, and attention deficit, hyperactivity disorder. (Tr. 86-87).  Dr. Goodman concluded that there was "[i]nsufficient [e]vidence" to assess this claim.  (Id.).

On March 4, 2011, Nathaniel Kaplan, M.D., completed a Physical Residual Functional Capacity Assessment of plaintiff, the results of which were identical to the conclusions reached by Dr. Khan.  (Tr. 88-89).

III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)(quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see

also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).   However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20

C.F.R. § 404.1520(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Crawford found that plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of February 6, 2006, through her date last insured of September 30, 2010.  (Tr. 12; see 20 C.F.R. § 404.1571 et seq.).  ALJ Crawford then concluded that plaintiff has the following severe impairments: degenerative changes of the cervical spine, status post C3-4, C5-6, and C6-7 decompression and fusion; history of left shoulder impingement; mild chrondromalacia in both knees; and obesity (Tr. 12-15; see 20 C.F.R. § 404.1520(c)), but that plaintiff does not have an impairment or combination of impairments that meet or medically equal the

15

severity of a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 15; see 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  The ALJ concluded that, during the relevant time, plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. § 404.1567(b) except that plaintiff, who is right-hand dominant, is limited to no overhead reaching with the left upper extremity, and only occasional pushing and pulling with the left upper extremity, and she is limited to bending her neck sideways in both directions and extending and flexing the neck to approximately forty-five degrees, and she can frequently climb ramps and stairs, balance, and stoop, but cannot kneel, crouch, crawl or climb ladders, ropes, or scaffolds.  (Tr. 15-20).  Accordingly, the ALJ concluded that jobs exist in significant numbers that plaintiff could have performed, and plaintiff was not disabled at any time from February 8, 2006, the alleged onset date, through September 30, 2010, the date last insured. (Tr. 20-21; 20 C.F.R. §§ 404.1569, 404.1569(a), and 1520(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ violated Social Security Ruling ["SSR"] 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996), by failing to consider the effect that plaintiff's right shoulder/upper extremity impairments had on her ability to work (Dkt. #19, Brief at 12-13); the ALJ erred in concluding that plaintiff can perform light work as her obesity and bilateral knee impairments render her incapable of standing or walking for six hours in an eight hour day (id. at 13-14); the ALJ failed to determine if there was a conflict in the vocational expert testimony and the Dictionary of Occupational Titles [or "DOT"] in violation of SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) (id. at 14-17); the ALJ failed to comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to plaintiff's treating physician's opinion (id. at 17-21); and the ALJ erred in her Step Five analysis. (Id. at 21-22).

In response, defendant contends that substantial evidence supports the ALJ's RFC finding as such finding is supported by the opinions of the state agency doctors (Dkt. #23, Brief at 4-5); there is no evidence that plaintiff's right shoulder impairment affected her for a continuous twelve months (id. at 6-7); the ALJ adequately considered the effect that plaintiff's severe knee impairment and obesity had on her RFC (id. at 7-8); the ALJ properly evaluated Dr. Shahid's opinion (id. at 9-10); and the ALJ correctly determined that plaintiff could perform a significant number of jobs at Step Five of the sequential evaluation process. (Id. at 10-11).

A. RFC ASSESSMENT

Plaintiff contends that the "ALJ completely ignored the medical evidence which showed that . . . [p]laintiff suffered severe right shoulder impairments before her date last insured of September 30, 2010 . . . ." (Dkt. #19, Brief at 12-13). Defendant counters that the ALJ was entitled to rely on the opinions of the state agency doctors, Drs. Khan and Kaplan, who concluded that plaintiff retained the RFC to perform light work, and was entitled to consider plaintiff's significant activity level. (Dkt. #23, Brief at 4-5). Additionally, defendant contends that plaintiff's right shoulder impairment does not affect her RFC. (Id. at 6-7).

SSR 96-8p directs the ALJ, when assessing a claimant's RFC, to "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" 1996 WL 374184, at *5. In her decision, the ALJ noted that:

> [Plaintiff] alleges that she cannot lift her arms up for any length of time. She alleges having bad pain in her shoulder area. She also alleges that excessive use of her arms causes discomfort to her arms, shoulders and elbow and causes stress in her shoulder muscles. She testified that holding objects sometimes causes pain in her arms, shoulders and back.

17

(Tr. 18).  The ALJ then found that plaintiff's "symptoms could reasonably be caused by her shoulder impingement[,]" and she found that plaintiff's allegations "are mostly credible with respect to her left upper extremity."  (Id.).  The ALJ referenced her history of tendinosis, her 2008 MRI results, and her treatment with Dr. DiGiovanni in 2008 before concluding that "the fact that [plaintiff] was doing a lot of work requiring continuous left shoulder motion at her job, suggests that the symptoms are not quite as severe as alleged."  (Id.).

Plaintiff contends that the ALJ erred in failing to consider the medical records of plaintiff's complaints of right shoulder pain in February, April, May, June and September 2006, and in January 2011.  (Dkt. #19, Brief at 12-13).  Plaintiff contends that "the ALJ failed to examine any link between the earlier medical evidence which showed right upper extremity impairments before the date last insured and the medical evidence in the record that originated after the date last insured."  (Id. at 13).

 On February 6, 2006,  plaintiff was seen by Dr. DiGiovanni, who noted her "exquisite shoulder pain," but he also noted that she "improved quite nicely" following a subacromial injection.  (Tr. 330-31).  Three months later, plaintiff was diagnosed with "impingement tendinosis[,]" and she underwent physical therapy until October 2006 when she was discharged for failing to attend her scheduled sessions.  (Tr. 328, 380; see Tr. 378-433).  The ALJ considered all of this evidence relating to plaintiff's right shoulder injury.[8] There is no record of plaintiff seeking treatment for right shoulder pain from October 2006 to January 2011, when she was seen by Dr. DiGiovanni for a shoulder impingement on January 31, 2011.  (Tr. 343).  At that time, he noted that her pain was the result of a new injury; plaintiff had a recent fall on the right side.  (Id.; see also Tr. 362 (injury occurred "in past couple

---

[8]Plaintiff was treated for left shoulder pain in September 2008.  (Tr. 327).

months")).  Accordingly, contrary to plaintiff's contention, the ALJ did not fail to examine a "link between the earlier medical evidence . . . before the date last insured and the medical evidence in the record that originated after the date last insured[,]" as such later evidence was the result of a new injury.  (See Dkt. #19, Brief at 13).

### B. CONSIDERATION OF PLAINTIFF'S SEVERE OBESITY AND BILATERAL KNEE IMPAIRMENTS

Plaintiff contends that the ALJ erred in failing to consider the effect of plaintiff's obesity on her musculoskeletal medical conditions when assessing plaintiff's RFC, as it "defies logic that the ALJ would find . . . [p]laintiff's obesity severe while also suffering severe bilateral knee impairments without finding any residual functional limitation" in her ability to stand and walk.  (Dkt. #19, Brief at 14).  Plaintiff, however, fails to cite to any medical evidence to support her contention, and the medical records reveal that plaintiff has sought only limited treatment for her knee pain, about which she did not begin to complain until 2009.  (Tr. 461-62, 473-74).

In her decision, the ALJ noted that plaintiff testified to needing a break from standing or walking after four hours, and the ALJ concluded that this symptom "could reasonably be caused by the claimant's chrondromalacia patella in both knees."  (Tr. 18).[9]  The ALJ acknowledged plaintiff's medical records regarding her knee pain, and noted that "[w]hile the medical evidence supports the existence of knee problems, other evidence suggests that the limitations are not as severe as alleged."  (Id.).  She appropriately noted that an agency employee had observed that plaintiff had no problems sitting, standing, or walking at an

---

[9]Light work, which the ALJ found plaintiff capable of performing, involves sitting most of the time, and a  "good deal of walking or standing[.]" 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).  "[T]he full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight-]hour workday."  SSR 83-10, at *6.

interview.  (Id.).  See SSR 96-7p, 1996 WL 374186, at *5 (S.S.A. July 2, 1996)("The adjudicator must also consider any observations about the individual recorded by [SSA] employees during interviews . . . ." ).  Additionally, the ALJ noted that plaintiff stands for two hours a day at her part-time job, and that she sought limited treatment for this condition. (Tr. 18).  Accordingly, she found plaintiff's allegations partially credible.  (Id.).

In March 2009, plaintiff complained to Dr. Bette of knee pain; she referred plaintiff to an orthopedist for an evaluation.  (Tr. 438).  When plaintiff saw Dr. Watson in May 2009, he noted "mild crepitus in both knees" and "very mild osteophyte formation on the patella consistent with some early degenerative change[,]" and his impression was that plaintiff had "[c]honodromalacia of the patella and probably iliotibial band tightness and sublaxation of both knees."  (Tr. 462, 474).  This is the extent of plaintiff's treatment for her knee pain. Thus, although plaintiff claims that the ALJ's finding that plaintiff's obesity is severe while also finding that plaintiff does not suffer limitations from her knee impairment "defies logic[,]" plaintiff fails to cite to any medical evidence to support her contention, and the medical records reveal that plaintiff sought limited treatment for her knee pain. To the contrary, the records reveal that plaintiff continues to be a "very active and physical person" who "recently did a lot of shoveling of dirt[,]" (Tr. 249), who directs lighting for five dance shows a year (Tr. 49, 461), who performs personal care activities, drives, does laundry, cleans, performs minor repairs around the house, mows the lawn, gardens (Tr. 193-97, 430), and who "tends to overdo" activity. (Tr. 395, 404-05, 421, 430).  Accordingly, the ALJ did not err in concluding that plaintiff's knee impairment and obesity did not preclude plaintiff from performing a limited range of light level work.

## C. TREATING PHYSICIAN OPINION

Plaintiff contends that the ALJ erred in failing to give proper weight to the opinion of

Dr. Shahid, "and/or failed to determine what he meant when he said 'she remains disabled.'" (Dkt. #19, Brief at 19-21). Defendant responds that the ALJ properly assigned Dr. Shahid's statements "little weight" because his opinion that plaintiff "remains disabled" is an opinion reserved to the Commissioner, and there were "no obvious gaps in the administrative record[,]" so that the ALJ was not under an obligation to seek an explanation from Dr. Shahid. (Dkt. #23, Brief at 9-10).

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." Burgess, 537 F.3d at 128, quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted). Generally, "the opinion of claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Burgess, 537 F.3d at 128, quoting 20 C.F.R. § 404.1527(d)(2)(now § 404.1527(c)(2))(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight.")(additional citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted). Under the treating physician rule, an ALJ assigns weight to the treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

21

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(d)(2)(now § 404.1527(c)(2)).  "After considering the above factors, the ALJ must 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'" Burgess,  537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(d)(2)(now § 404.1527(c)(2))(stating that the agency "will always give good reasons  in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion."(emphasis added)).

Plaintiff's medical records include treatment records from Dr. Shahid from 2004 forward. (See, e.g., Tr. 251-59, 266-75, 277-81).  Dr. Shahid performed plaintiff's back fusion surgery on February 8, 2006, the date plaintiff alleges is her onset date of disability (Tr. 233-39, 476-77, 479-82), and was seen by Dr. Shahid regularly following that surgery.  He routinely noted her improvement: in March 2006 her strength was "normal" and he recommended physical therapy because her range of motion was "slightly" decreased (Tr. 265), in May 2006 plaintiff's range of motion was "good" (Tr. 264), and in March 2007 she had a "reasonable range of motion[.]"(Tr. 246).  In December 2006, Dr. Shahid noted plaintiff's continued complaints of myofascial pain, but he also observed that plaintiff was a "very active and physical person[,]" and that she had "recently [done] a lot of shoveling of dirt[;]" he advised her to exercise and to use a muscle relaxant at night.  (Tr. 249).  By March 2007, Dr. Shahid discharged plaintiff from regular care, indicating that she would be seen on an as needed basis only.  (Tr. 246).  Almost four years later, plaintiff returned to Dr. Shahid for "some discomfort in [the] middle of [her] back[,]" and she complained of a "problem with [her right] hand [and] arm." (Tr. 351-52).  At that time, while the "degree [of her spinal] stenosis at C3-4 and C6-7 [had] worsened from the prior examination[,]" it was "no greater than mild in severity." (Tr. 349-50, 471-72).  Two weeks later, Dr Shahid noted that plaintiff "clearly

has lost cervical range of motion[,]" she has "severe tendonitis in the right elbow[,]" and her neck "bothers her a lot." (Tr. 348). It was at this appointment in January 2011, almost five years after her onset date, and three months after her date last insured, that Dr. Shahid opined that plaintiff "has continued to learn to live with her disability. She remains disabled." (Id.).

In her decision, the ALJ noted the long-term "treatment relationship" Dr. Shahid had with plaintiff, and in light of such relationship, and "due to the level of support for the assessment in the evidence of record[,]" afforded Dr. Shahid's assessment "great weight" in her RFC assessment of plaintiff. (Tr. 19). The ALJ continued, however, that the "statement of Dr. Shahid that . . . [plaintiff] 'remains disabled' is given little weight because the terms 'disabled' and 'disability' are legal terms of art, meaning that the disability analysis is not solely a question of medical fact." (Tr. 20). The ALJ was correct in her assessment as it is well settled that "some kinds of findings--including the ultimate finding of whether a claimant is disabled and cannot work--are reserved to the Commissioner. . . . [T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)(internal citations & quotations omitted); 20 C.F.R. § 404.1527(d)(opinions that a claimant is disabled or unable to work are opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case). Additionally, for the reasons stated in Section IV.A. supra, substantial evidence supports the ALJ's RFC determination, and plaintiff points to no gaps in the administrative record requiring the ALJ to recontact Dr. Shahid.

### D. APPLICATION OF SSR 00-4p: VOCATIONAL EXPERT TESTIMONY AND DOT

Plaintiff contends that the ALJ erred in failing to solicit testimony from the vocational

expert to reconcile what plaintiff contends was an inconsistency between the vocational expert's testimony that plaintiff could perform the work of a receptionist, which work is "sedentary" as defined by the DOT, and the ALJ's ultimate conclusion, because if plaintiff was limited to sedentary work, she would be found disabled.  (Dkt. #19, Brief at 14-17). Additionally, plaintiff contends that the vocational expert assigned the wrong numbers to the jobs that he identified as jobs plaintiff could perform, or correspond to positions with different vocational characteristics, or that are unavailable in the local economy.  (Id.). Defendant counters that the vocational expert specifically identified that plaintiff could perform the work of a "'receptionist at the light level[,]' which suggests the [vocational expert] was cognizant of the fact that the DOT qualifies the 'receptionist' position as a sedentary position[.]" (Dkt. #23, Brief at 11 & n.3 (emphasis omitted); see Tr. 62).

In response to the hypotheticals posed by the ALJ, Dr. Sachs testified that plaintiff could perform work as a receptionist, a general office clerk, and a production inspector (Tr. 62-63); however, the vocational expert assigned to the "receptionist" job the DOT number that corresponds to "information clerk[,]" and assigned to the "production inspector" job the DOT number that corresponds to "pencil inspector." (Id., see U.S. Dept. of Labor, Dictionary of Occupational Titles, 4th ed., 237.367-018, 733.687-062).  SSR 00-4p, provides that "[o]ccupational evidence provided by a [vocational expert] . . . generally should be consistent with the occupational information supplied by the DOT[,]" and "[w]hen there is an apparent unresolved conflict between [vocational expert] . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] . . . evidence to support a determination or decision about whether the claimant is disabled." 2000 WL 1898704, at *2. In this case, as defendant observes (Dkt. #23, Brief at 11, n.3), the vocational expert testified that "plaintiff is capable of work as a receptionist at the light

24

level[,]" thereby testifying that plaintiff is capable of receptionist work that exceeds the definition of such work at a sedentary level.[10] (Tr. 62).  This vocational expert distinguished between the job as it is generally performed and defined by the DOT, and how it can be performed by plaintiff.  See Serrano v. Astrue, No. 10 CV 468 (JCH), 2011 WL 1399465, at *13 (D. Conn. Apr. 12, 2011)(vocational expert's testimony that deviates from the DOT does not conflict with DOT when the vocational expert distinguished between the requirements of the job as it is generally performed, and the requirements of how it is actually performed by plaintiff). The Second Circuit has explained that:

> Whereas the [DOT] describes jobs as they are generally performed, an expert is often called upon to explain the requirements of particular jobs, and as such, his deviations from the [DOT] in such testimony do not actually "conflict" with the [DOT].  Many specific jobs differ from those jobs as they are generally performed, and the expert may identify those unique aspects without contradicting the [DOT].

Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003).  Accordingly, the vocational expert's testimony regarding plaintiff's ability to perform receptionist work at the light level did not contradict with the DOT, and the ALJ did not err in relying on such testimony.

Plaintiff is correct, however, that the vocational expert's testimony relating to the job of a "production inspector" while referencing the DOT number of a "pencil inspector[,]" (Tr. 63), further limited the number of jobs available to plaintiff as there are no pencil manufacturing

---

[10]Additionally, the vocational expert cited DOT code 237.367-018, which refers to an "information clerk" position, which is a light level position, not the sedentary-level receptionist position.  (Tr. 62).

Plaintiff offers no support for her contention that plaintiff could not perform the job of "information clerk" as such job requires a Reasoning Level 4 capacity, which plaintiff contends exceeds her ability as she is limited to a high school education.  (Dkt. #19, Brief at 17).  In this case, in addition to seeking benefits on the basis of her physical impairments, plaintiff claims that she suffers from ADD, but, as the ALJ properly found, plaintiff's ADD, for which she takes medication, does "not cause more than minimal limitation in [plaintiff's] ability to perform basic mental work activities and [is] therefore nonsevere."  (Tr. 14).  Plaintiff does not claim any other mental limitations.

companies in Connecticut.  (Dkt. #19, Brief at 16).  That said, however, the vocational expert also testified that plaintiff could perform the work of a general office clerk, which job exists in significant numbers, as the vocational expert testified that there were 227,000 general office clerk jobs nationally and 2,500 in the local economy. (Tr. 62-63).  The ALJ is required to show that work "exists in significant numbers in either the region where such an individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A); see also 20 C.F.R. §§ 404.1566(a) & (b).  "[C]ourts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers[,]" Barbato v. Astrue, No. 09 CV 6530T, 2010 WL 2710521, at *7 (W.D.N.Y. July 7, 2010)(citation omitted), but "[c]ourts have adopted a relatively low threshold number." Id., citing Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993)(1,400 jobs is a significant number); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987)(174 positions within the local economy is a significant number); Dumas v. Schweiker, 712 F.2d 1545, 1549, 1553-54 (2d Cir. 1983)(150 jobs regionally constituted significant numbers).   In this case, the ALJ was entitled to rely on such testimony as the vocational expert identified a significant number of jobs available. See Flores v. Astrue, No. 09 CV 1829 (JCH)(HBF), 2010 WL 5129121, at *10, 15 (D. Conn. Sept. 24, 2010)(affirming the ALJ's findings among which was the identification of a significant number of jobs available in occupations with 1,500 positions within the region and 150,000 positions nationwide, 1,200 positions within the region and 100,000 nationally, and 900 positions within the region and 130,000 nationally), approved and adopted, 2010 WL 5129110 (D. Conn. Dec. 9, 2010).

## V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Order Reversing the

Decision of the Commissioner or in the Alternative Motion for Remand for Rehearing (Dkt. #19) is <u>denied</u>; and defendant's Motion for an Order Affirming the Commissioner's Decision (Dkt. #23) is <u>granted</u>.

The parties are free to seek a district judge's review of this recommended ruling.  <u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 2nd day of September, 2014.


 /s/ Joan G. Margolis USMJ
Joan Glazer Margolis
United States Magistrate Judge